# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-831V
UNPUBLISHED

| | |
|---|---|
| PETER WEIL, | Chief Special Master Corcoran |
| Petitioner, | Filed: January 6, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Ruling on the Record; Damages; Influenza (Flu) Vaccine; Guillain-Barre Syndrome (GBS) |
| Respondent. | |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*

*Meghan Murphy, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION AWARDING DAMAGES[1]

On February 1, 2021, Peter Weil filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered from Guillain Barré syndrome ("GBS") caused by an influenza ("flu") vaccine administered on September 26, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement has been found in the Petitioner's favor, the parties could not agree to damages.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I award **$140,000.00** in damages, representing compensation for actual pain and suffering, plus **$1,331.67** representing out-of-pocket unreimbursed expenses.

## I.      Relevant Procedural History

This case was initiated on February 1, 2021. On August 6, 2021, Respondent filed a Rule 4(c) Report recommending compensation because Petitioner satisfied the Table criteria for a flu-GBS claim. ECF No. 13. A ruling on entitlement was therefore entered on August 6, 2021. ECF No. 14. The parties reached a tentative agreement on unreimbursed expenses, but were unable to resolve pain and suffering. ECF No. 23. Briefs were submitted in support of damages by both parties on March 25, 2022. ECF Nos. 25, 27.

## II.     Petitioner's Medical Records

Mr. Weil was sixty-one when he received a flu vaccine on September 26, 2019. Ex. 1 at 3.

On October 6, 2019 (ten days after his vaccination), Petitioner presented to urgent care complaining of numbness, tingling, and weakness in both legs that started a day earlier. Ex. 5 at 58. Petitioner reported that he had "bilateral leg pain for 30 hours", along with loss of strength. *Id.* at 57-58. He also reportedly fell that morning. *Id.* at 58. An exam indicated his deep tendon reflexes in his knees were absent, and he exhibited decreased knee and hip flexion. Petitioner was sent to the emergency department for further evaluation. *Id.* at 58-59. As he was leaving the urgent care facility, Petitioner tripped and fell in the lobby. Ex. 3 at 33.

Petitioner presented to the University of Wisconsin's emergency department on October 6, 2019, and was evaluated by Dr. Marish Shah. Ex. 3 at 15, 21, 23. Dr. Shah noted Petitioner had abnormal reflexes and muscle tone, and was diagnosed with GBS due to his "history of recent influenza and shingles vaccines…." *Id.* at 26-29. Petitioner underwent an MRI and a lumbar puncture, and was further examined by neurologist Ditte Primdahl. *Id.* at 58-60. Dr. Primdahl noted that the mostly likely proper diagnosis was AIDP (acute inflammatory demyelinating polyneuropathy), and ordered Petitioner be admitted for continued workup and treating with IVIG. *Id.* at 60.

On October 7, 2019, Petitioner began physical therapy. Ex. 3 at 107. At that time, Petitioner exhibited weakness, required total assistance to climb five steps with a railing, was unable to perform any heel to shin movements, and exhibited balance issues due to decreased sensation in his legs. *Id.* at 109-110.

During Petitioner's hospitalization, Petitioner's condition worsened and he experienced proximal upper extremity weakness and mild progression of sensory changes. Ex. 3 at 63. He also reported overnight pain in his buttocks and hips and headaches from the IVIG treatment. *Id.* at 63, 78, 89. Petitioner was discharged on October 10, 2019. *Id.* at 61-67. At that time, his strength was improving. *Id.* at 63.

On October 10, 2019, Petitioner began a twenty-day stay at the University of Wisconsin Health Rehabilitation Hospital. Ex. 4 at 32. Initially, Petitioner exhibited significant lower-extremity weakness, decreased balance, slow gait speed, decreased sensation in his legs, and neuropathic pain. *Id.* at 24. Petitioner was instructed to complete sixty to ninety minutes of physical therapy and occupational therapy daily, five days a week. *Id.* at 31.

As of his discharge on October 30, 2019, Petitioner had improved but exhibited mobility deficits including the need to use a wheelchair, requiring assistance for walking 10 feet on uneven surfaces, and using a front wheeled walker. Ex. 4 at 36-37. He also continued to report neurological issues including numbness in the tips of his fingers, reduced strength in his lower body, and reduced reflexes in his patella. *Id.* at 37.

On November 5, 2019, Petitioner obtained an initial evaluation from physical therapist Angela Liautaud. Ex. 5 at 52. He exhibited gait difficulty, weakness, impaired mobility, imbalance, and reduced sensation to light touch below the knees. *Id.* An examination noted Petitioner's lower extremities were "quite numb" and exhibited reduced muscle tone in his legs. *Id.* at 54.

Petitioner was seen by Dr. Derek Hubbard on November 11, 2019 for a follow-up. Ex. 2 at 40. Dr. Hubbard noted that Petitioner had gained 50%-75% of his strength back, although he was still using a walker. Ex. 2 at 40. Petitioner also stopped taking medications for spasms and paresthesias including gabapentin and baclofen. *Id.*

Petitioner attended seven physical therapy visits between November 25, 2019 and December 30, 2019. Ex. 5 at 17-41. Petitioner improved during this time. On November 25, 2019, he reportedly started walking with his dog for short distances. Ex. 5 at 40. By December 30, 2019 Petitioner was able to jog "30 yard intervals" and had "nearly achieved the age appropriate average distance for the 6 minute walk test *Id.* at 17, 19. He also reported no sense of weakness in his legs, and improved balance. *Id.* at 17.

Petitioner saw Dr. Douglas Dulli on December 18, 2019. Ex. 8 at 217. At that time, Dr. Dulli noted Petitioner had made "tremendous improvement in his weakness &

numbness." *Id.* at 219. Further, Petitioner "feels that his strength is almost 100% back at baseline", although he still had some mild hip weakness. *Id.* Petitioner also reported some continued numbness in his feet, some gait imbalances, and poor proprioception in his extremities. *Id.* at 219. Dr. Dulli indicated that Petitioner was "nearly at baseline" at that time. *Id.* at 223.

Petitioner had a telemedicine visit several months later, on May 6, 2020. Ex. 6 at 1. At that time, Petitioner reported some residual numbness on the top of his right foot, occasional imbalance, and difficulty running down stairs. No additional follow-up was necessary at that time. *Id.* at 1.

On May 20, 2020 Petitioner discussed his condition with Dr. Aaron Struck. Ex. 8 at 99-100. Petitioner reported continued episodes of gait imbalance, although they were rare, and some numbness in his right foot. *Id.* He also reported his strength had completely returned. *Id.* Dr. Struck noted that Petitioner was "nearly at baseline other than minimal numbness in the R plantar foot, rare gait imbalance without falls, & urinary urgency." *Id.* at 103.

Almost a year later, Petitioner returned to Dr. Hubbard on March 2, 2021 for a routine physical exam. Ex. 8 at 51-52. At that time, he reported minor bladder irritation, lingering right foot numbness, and occasional low back pain. *Id.* at 51. Petitioner again saw Dr. Hubbard the next year for a physical. Ex. 10 at 10. He continued to complain of lingering symptoms that had "not changed much". *Id.*

### III.    Affidavit Evidence

Mr. Weil submitted two declarations in support of his petition. Exs. 7, 11. In his first, Petitioner described the onset and treatment of his acute GBS, as well as his recovery. Petitioner described the initial diagnoses and treatment, including the pain he experienced and fear when his condition initially deteriorated. Ex. 7 at 1-3. In a supplemental statement, Petitioner notes that he has not regained all of his physical faculties, but continues to suffer from foot numbness and imbalance, and less bladder control. Ex. 11 at 2.

### IV.    Damages

The sole contested damages component to be decided is pain and suffering. Petitioner requests an award of $180,000.00. Petitioner's Brief on Damages ("Pet. Br.") at 1. Respondent argues that an award of $107,500.00 for pain and suffering is reasonable in this case. Respondent's Brief on Damages ("Res. Br.") at 1. The parties

have agreed to $1,331.67 for unreimbursed out-of-pocket expenses. Pet. Br. at 1 n.1, Res. Br. at 9.

## V.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum (between zero and the $250,000.00 cap), that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not control the process used herein to calculate pain and suffering, it stands as wise counsel.

## VI.    Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact the awareness of his injury. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. Petitioner's medical records, affidavit, and supplemental affidavit provide descriptions of the pain and suffering he experienced during his illness. Petitioner cites to a number of damages decisions involving GBS injuries.[4] Pet. Br. at 13-15. Petitioner also noted that awards in proffered GBS cases typically range from approximately $128,072.42 and the cap, and that here Petitioner's case "should be worth considerably more than the 'median' amount cited" in the proffered cases. *Id.* at 15, citing *Turner v. Sec'y of Health & Hum. Servs.*, No. 19-1051V, 2021 WL 3834198 (Fed. Cl. Spec. Mstr. July 27, 2021).

Respondent argues that Petitioner's course was less severe than previous cases

---

[4] In particular, Petitioner cited to *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering); *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021) (awarding $170,000.00 for pain and suffering); and *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) (awarding $180,000 for pain and suffering).

where damages had to be decided. Petitioner underwent one round of IVIG, and recovered relatively quickly. Res. Br. at 6-8. Further, the only GBS-related sequelae Petitioner continues to experience was lingering numbness in his right foot and some balance issues. *Id.* at 7-8.

After reviewing the record in this case and considering the parties' written arguments I find that the record best supports the conclusion that Petitioner's condition was initially severe, but that he quickly improved to a more moderate level on the spectrum of GBS cases.

The majority of Petitioner's treatment occurred in October 2019 – very close-in-time to his vaccination. On October 6, 2019, Petitioner reported weakness in his lower limbs that started approximately nine days after his vaccination, resulting in multiple falls. Ex. 5 at 57-59, Ex. 3 at 33. Petitioner was admitted to the hospital for five days where he underwent one round of IVIG treatment, an MRI, and a lumbar puncture. Ex. 3 at 61-67. Thereafter, Petitioner spent twenty days in a rehabilitation hospital. Ex. 4 at 32. During that time, his strength, balance, and mobility improved significantly. However, upon discharge on October 30, 2019, he still required a front-wheeled walker and wheelchair for mobility and experienced numbness in his extremities. *Id.* at 36-37.

Petitioner attended additional physical therapy sessions between November 25, 2019 and December 30, 2019, and continued to improve. Petitioner stopped taking medications for spasms and paresthesias by November 11, 2019. Ex. 2 at 40. By December 18, 2019, he reportedly felt that he was nearly back to baseline. Ex. 8 at 219. Petitioner continued to report lingering mild numbness in his right foot and some imbalance, but as of May 20, 2020 his strength had completely returned. *Id.* at 99-100.

I find the damages determinations from other cases where pain and suffering awards ranged from $170,000.00 to $180,000.00 to involve more severe GBS, and where the injured parties experienced far worse prognoses subsequent to their initial hospitalizations and could no longer work (or were out of work for several months), attended far more physical therapy visits, and continued to require medication for pain specifically related to the GBS. *See, e.g.*, *Johnson* 2018 WL 5024012, at *7-8; *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069, at *14 (Fed. Cl. July 29, 2019), *aff'd in part and remanded*, 147 Fed. Cl. 131 (2020); *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL 1915138, at *6 (Fed. Cl. Mar. 26, 2020).

Here, by contrast, Petitioner's recovery was much quicker, and the record does not indicate that he has experienced continued treatments or deficiencies specifically related to his GBS aside from some lingering mild numbness, rare instances of imbalance, and some urinary urgency. Ex. 8 at 99-100. In fact, Petitioner reported by May

20, 2020 (a little more than seven months post-onset) that he was "nearly at baseline...." Ex. 8 at 103. For these reasons, I cannot find that his GBS injury and its sequelae were of such high severity to justify an award of the magnitude he has requested.

Nevertheless, GBS is a serious and frightening vaccine injury, and Petitioner's pain and suffering award should be calculated with that in mind. Prior to vaccination, Mr. Weil was active and relatively healthy, which likely contributed his eventual recovery, but also underscores the impact his illness had on his life. He endured several weeks of care in hospital and rehabilitation facilities, and several months of physical and occupational therapy thereafter. During the months following his GBS diagnosis, Petitioner also suffered a loss of enjoyment of activities in which he once participated. Although he could ambulate independently, he required the use of a walker for a period of time. For these reasons, I find that Respondent's recommendation of $107,500.00 is too modest.

Petitioner's situation is most similar to the petitioner in *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Mar. 30, 2022) (awarding $125,000.00 for pain and suffering). That petitioner's GBS was found to be on the moderate end of severity in GBS cases - but he underwent an intense initial treatment period including a nine-day hospitalization stay and 30 days at an inpatient rehabilitation facility. *Id.* at *9. The *Castellanos* petitioner recovered relatively quickly thereafter, but still required use of a walker more than three months later. *Id.* Moreover, within about five months of GBS onset, he reported that he was feeling "very well." *Id.* at 10. Similarly, Mr. Weil required an intense initial period of treatment, but thereafter experienced significant improvement. Mr. Weil did describe significant pain during his hospital stay, unlike the petitioner in *Castellanos*. Further, Mr. Weil did not exhibit comorbidities that may have reduced the value of the award in *Castellanos*. *Id.*

Balancing the severity of a GBS injury and Petitioner's personal loss against the relatively low severity of his moderate disease course and treatment requirements, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$140,000.00** in compensation for actual/past pain and suffering is reasonable and appropriate in this case. His experiences exceed in severity those of the *Castellanos* petitioner, but (as noted) do not rise to the levels experienced by the other petitioners offered from Mr. Weil's comparable cases.

### Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $141,331.67 (representing an award of $140,000.00 for past pain and suffering, and unreimbursed expenses of $1,331.67) in the form of a check payable to Petitioner.**

This amount represents compensation for all items of damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.